# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

**CIVIL ACTION NO.: 4:08CV-15-M**

| | |
|---|---|
| **VANESSA L. POTTS and JOHN L. POTTS** | **PLAINTIFF** |
| **v.** | |
| **MARTIN & BAYLEY, INC., d/b/a/ Hucks**, **CATLOW, INC. and HUSKY CORPORATION** | **DEFENDANTS** |
| **and** | |
| **MARTIN & BAYLEY, INC., d/b/a/ Hucks** | **CROSS-CLAIMANT** |
| **v.** | |
| **CATLOW, INC. and HUSKY CORPORATION** | **CROSS-DEFENDANTS** |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court upon motions for summary judgment by the defendant, Martin & Bayley, Inc., d/b/a Hucks ("Martin and Bayley") [DN 75], and by the defendants and cross-defendants, Catlow, Inc. ("Catlow") [DN 69] and Husky Corporation ("Husky") [DN 57]. Also before the Court are motions in limine by the defendant, Martin and Bayley [DN 65 and DN 77], a motion by Catlow for sanctions for evidence spoliation [DN 70], a motion by Martin and Bayley for a hearing [DN 83] and to seal [DN 122], and a motion by the plaintiffs, Vanessa L. Potts and John L. Potts, to strike [DN 89]. Fully briefed, these matters are ripe for decision.

# I. FACTUAL BACKGROUND

This case arises out of an accident that occurred at the Morganfield, Kentucky Huck's station on January 14, 2008. While on their way home from a school event, Vanessa Potts and her son W.P., who was 10 years old at that time, stopped at Huck's to fill Mrs. Potts' automobile with gasoline. (Vanessa L. Potts Dep. 23:13-18, Sept. 11, 2008.) After Mrs. Potts parked her car at pump #1, W.P. took his mother's credit card and initiated a pay-at-the-pump transaction for regular unleaded fuel,[1] and engaged the automatic shutoff mechanism to the quickest setting. (W.P. Dep. 26:16-19; 28:19-23; 29:18-20, Sept. 11, 2008.) While the fuel was pumping, he got back in the car. (Id. 30:11-17.) After some time had passed, Mrs. Potts asked W.P. if the pump had "clicked off." (V. Potts Dep. 43:18-24.) After mentioning to his mother that the numbers on the pump were no longer advancing, he got out of the car to complete the transaction. (WP. Dep. 32:9-11, 33:12-17.) As W.P. got out of the car, he noticed that fuel had accumulated into a puddle on the ground and that gasoline was still flowing out of the tank. (Id. 33:19, 34:11-16.) W.P. tried to detach the lever for the automatic shutoff mechanism and tried squeezing the handle to get the fuel to stop pumping. (Id. 36:20-37:1.) The latch released, but that did not stop the fuel from overflowing. (Id. 37:2-6.)

Mrs. Potts then heard W.P. say, "Mom, I need help. The pump hasn't shut off." (V. Potts Dep. 47:20-23.) She immediately opened the driver's door to get out of the car, and as she put her left foot down the on the ground, white flames ignited around her leg from the

---

[1]        Attached to this pump were two Catlow brand nozzles and one Husky brand nozzle. The identity of the company that manufactured the nozzle used by W.P. is hotly contested.

gasoline that had accumulated on the ground. (Id. 51:21-23.) Rather than exiting out of the driver's door where the fire had ignited, she climbed to the other side of the car and escaped out of the passenger door. (Id. 52:16-22.) Her left leg was on fire and W.P. instructed his mother to "stop, drop, and roll;" she complied, but this did not extinguish the flame. (W.P. Dep. 43:15-21.) So W.P. took a shoe that had fallen off Mrs. Potts' foot as she ran from the fire and starting beating out the flame as she continued rolling. (Id. 43:23-44:8.) Through these efforts, the flame was extinguished, (id.,) but not before Mrs. Potts suffered second and third degree burns. Shortly thereafter, first responders arrived on the scene to treat Mrs. Potts' injuries and to fight the fire that still engulfed her car. According to Fire Marshal Phil Fogle, firefighters at the scene reported that the nozzle was on ground when they arrived and that it was still pumping gas. (Hazardous Material Incident Report, Feb. 21, 2008 at pp. 2-3.) Because of other nozzle failures reported to Fogle at this particular Huck's station, he ordered Mark Bayley, one of Huck's owners, to take all old nozzles out of service and replace them. (Id.)

The Potts originally brought this claim only against Martin and Bayley for negligence and premises liability, (See DN 1,) but subsequently amended their complaint to assert products liability claims against Catlow and Husky. They alleged that the nozzle supplied to Martin and Bayley and used by W.P. was "defective and unreasonably dangerous because of defects in manufacture, design, instructions and/or warnings," (DN 19.) Martin and Bayley asserted a third-party complaint against Catlow and Husky for indemnity similarly arguing that the nozzle used by W.P. was defective.

## II.  EVIDENTIARY MOTIONS

Before addressing their substantive motions, the Court will first address various evidentiary issues raised by the parties.  Martin and Bayley seeks to exclude at trial evidence of other overflow incidents that occurred at this Huck's station.  It also seeks to exclude the testimony of one of the plaintiffs' experts, Wolf Koch.  Catlow seeks the dismissal of the claims asserted against it by Martin and Bayley because of spoliation of evidence.  Each of these motions will be addressed in turn.

### A.  Evidence of Other Overflow Incidents

Martin and Bayley seeks to exclude evidence of other overflows that occurred at this Huck's station.  It argues that evidence of these other overflows is irrelevant because the other incidents are not substantially similar to the incident that occurred on January 14, 2008.  In response, the Potts argue that this evidence is relevant to show that a dangerous condition existed on Martin and Bayley's premises, to show that Martin and Bayley had notice of the dangerous condition, and to establish a routine practice of Martin and Bayley.

Of the seven incidents that the plaintiffs seek to introduce, four of them occurred at pump #1, the same pump used by W.P.  (Benny Johnson Dep. 11:19-23, Dec. 19, 2008; Suzanne Walker Dep. 21:8-10, Dec. 19, 2008; Sherry Duncan Dep. 13:4-22, Dec. 19, 2008; Jamey Ashby Dep. 11:4-13, Sept. 10, 2008.)  Additionally, each of these customers used regular unleaded fuel, the same type of fuel used by W.P.  (Johnson Dep. 18:6-8; Walker Dep. 22:4-8; Duncan Dep. 20:3-7; Ashby Dep. 11:24-12:1.)  And of the incidents that occurred at pump #1, all of the users had engaged the automatic shutoff mechanism, but the fuel failed to stop

pumping when the tank was full. (Johnson Dep. 16:12-18, 17:3-15; Walker Dep. 14:25-15:1, 15:24-16:14; Duncan Dep. 16:12-16, 17:3-10; Ashby Dep. 21:20-23, 24:21-25.) As a result, the excess fuel overflowed from the tank until the customer could get the pump to shut off. (Johnson Dep. 18:1-5; Walker Dep. 16:11-14; Duncan Dep. 17:10-20; Ashby Dep. 25:6-15.) Three of those four users reported their incident to the attendant on duty and they testified that while they were there, the attendant did nothing to respond to the situation. (Johnson Dep. 18:9-14, 21:3-18; Duncan Dep. 18:13-14, 18:21-19:24; Ashby Dep. 29:19-30:16.) One customer even reported the incident to a district manager who gave her a $20 Huck's gift certificate. (Ashby Dep. 31:6-32:3.) All of these incidents occurred approximately two to four weeks prior to the Potts' incident. The plaintiffs also seek to introduce three other incidents that occurred within the days and weeks preceding the Potts' incident. Two of the incidents occurred at pump #6 and the other at either pump #6 or pump #8. (Michael Schmied Dep. 6:13-7:1, Dec. 19, 2008; Connie Funk Dep. 16:22, Dec. 19, 2008; Jo Sheridan Dep. 10:13-11:17, Dec. 19, 2008.) During two of the incidents, the customer used the automatic shutoff mechanism, but the latch did not release when the tank was full causing an overflow. (Schmied Dep. 7:23-25; 9:4-7; Funk Dep. 19:2-3, 19:21-20:7.) In the other incident, the customer manually pumped the gas, but the gas did not stop pumping when the tank was full. (Sheridan Dep. 13:6-9.) This customer had to release the handle to stop the gas from overflowing. (Id. 14:23-15:2.) Each of these customers testified in their depositions that they reported the incident to the attendant, but that the attendant did not take any action while they were there. (Schmied Dep. 10:6-11; Funk Dep. 24:8-20; Sheridan Dep. 15:19-16:1.)

*Evidence of Dangerous Premises and Notice of Dangerous Condition*

The plaintiffs argue that these prior incidents are relevant to show that Martin and Bayley not only had notice of a dangerous condition on their premises, but also, to prove that a dangerous condition actually existed. The standard for relevancy in both cases is "substantial similarity." Rye v. Black & Decker Mfg. Co., 889 F.2d 100, 102 (6th Cir. 1989); see also Miller v. Norfolk & W. Ry. Co., 178 F.3d 1295 (table), 1999 WL 196554, at *6-7 (6th Cir. 1999). That is, the "prior accidents must be 'substantially similar' to the one at issue before they will be admitted into evidence." Id. (citing Koloda v. Gen. Motors Parts Div., Gen. Motors Corp., 716 F.2d 373, 376 (6th Cir. 1983)). This means that the prior accidents must have "happened under substantially the same conditions at substantially the same place as the accident in suit and at a time not too remote therefrom." N.Y. Life Ins. Co. v. Seighman, 140 F.2d 930, 932 (6th Cir. 1944) (citing Sears, Roebuck & Co. v. Copeland, 110 F.2d 947 (4th Cir. 1940)); Rye, 889 F.2d at 102 ("the accidents must have occurred under similar circumstances or share the same cause.") (citation omitted).

The Court finds that these requirements are satisfied with regard to each witness identified by the plaintiff. In each incident that occurred at pump #1, the customer selected the regular unleaded nozzle. In each, the customer activated the automatic shutoff mechanism. And in each, that latch did not work properly because the fuel continued to pump even after the tank was full causing an overflow. Furthermore, all of these incidents occurred within the two to four week period preceding the incident involving the Potts. Because Martin and Bayley disputes the existence of a dangerous condition in the nozzle used by W.P., or elsewhere in their

fuel system, the plaintiffs may use these prior incidents to circumstantially show that a dangerous condition was present. And to the extent the customers notified the Huck's attendant of these spills, the incidents are relevant to show that Martin and Bayley was on notice of a dangerous condition on their premises.

The incidents that occurred at pump #6 and pump #8 are also substantially similar, although a different nozzle was used. Each of those customers selected regular unleaded fuel. Each of them either engaged the automatic shutoff mechanism or held the handle in a way that the fuel should have stopped pumping when the tank was full. And for each of them, the fuel did not stop pumping when their tank was full causing an overflow. Furthermore, some of these incidents occurred within days of the Potts' incident. From this evidence, when viewed in conjunction with the testimony of Wolf Koch, an expert for the plaintiff, the jury could conclude that the maintenance and inspection practices at this Huck's station were deficient and that Martin and Bayley should have been aware that its premises were dangerous. In particular, Koch opines that the "[e]quipment inspection, maintenance and replacement procedures at Huck's did not conform to manufacturers', industry, or national requirements adopted by the Kentucky State Fire Marshal." (Koch Expert Report at 5, Dec. 9, 2009.) He further indicates that in his "25 years of working with gasoline dispensing equipment, [he has] never experienced a station or heard of a station with the number of nozzle shutoff problems experienced by the Morganfield Huck's site in a relatively short time period." (Id. at 12.)

The Sixth Circuit addressed a similar issue involving substantial similarity in Seighman. There, a plumber had fallen from the fourth floor landing of a stairwell after the railing gave

way. Seighman, 140 F.2d at 931. The plumber brought suit against the building owner arguing that the premises were unsafe. At trial, another plumber testified that on a prior occasion, while he was working on the third floor landing, he complained of a similar railing that started to give way. Id. at 932. On appeal, the building owner argued that the testimony of the second plumber was irrelevant. The Sixth Circuit disagreed. The court concluded that "[s]uch evidence is relevant as tending to show the dangerous condition of the premises, and appellant's knowledge of such condition . . . ." Id. It pointed out that "[t]he stairway was on the outside of the building and exposed to the inclemency of the weather, and as the building was some thirty years old, it is evident that both railings were similar parts of a structure, liable to fall into disrepair if neglected by persons responsible for their condition." Id. Like, Seighman, Koch is expected to testify at trial that nozzles for fuel pumps will fall into disrepair if they are not properly inspected and maintained by responsible parties. Therefore, if nozzles at pumps #1, #6, and #8 were malfunctioning, and if the jury credits Koch's testimony that such incidents are likely to occur where the premises are not properly maintained, then the jury could properly infer that the premises were in a dangerous condition.

Martin and Bayley argues that Seighman is distinguishable because the railings at issue were in a constant condition, i.e., once the railings became rotten, they remained rotten until repaired. On the other hand, they contend that nozzles at gas stations only intermittently fail and that simply because a customer spills gasoline does not necessarily mean a nozzle is defective. It insists that absent consecutive complaints, it is proper to assume that each spill was a matter of customer error. But the testimony of these witnesses is not simply that they had

gasoline spillage. Rather, each of them testified that the automatic shutoff mechanism of the nozzle failed; that although the tank was full, the nozzle kept pumping gas. Just as the rotten wood on the third floor landing of the stairwell in Seighman was evidence that the premises were unsafe, these other incidents at the Morganfield Huck's station are likewise evidence that Martin and Bayley's premises were unsafe.

Martin and Bayley points out that it had recently put Husky nozzles on various pumps and that W.P. may have been utilizing one of those new nozzles. It also points out that there were likely two regular unleaded nozzles attached to pump #1. It argues that without evidence that these customers used an identical pump and nozzle, the circumstances are not substantially similar. The Court disagrees. For one thing, Martin and Bayley's own expert has concluded that W.P. was likely using a Catlow nozzle. Furthermore, just as a defect in the third floor railing in Seighman could allow the jury to conclude that the fourth floor railing was unsafe, the same is true here. These pumps were at the same gas station under the control of the same employees and these incidents occurred within a relatively short time period. This is sufficient under the circumstances of this case to make their incidents substantially similar to the Potts' incident. Martin and Bayley also contends that the testimony of these other witnesses would be unduly prejudicial because it would create mini-trials within the trial. The Court disagrees. The Court does not foresee that the cross-examination of these witnesses who contend that the automatic shutoff mechanism failed will be so prejudicial so as to substantially outweigh the

probative value of their testimony.[2] Therefore, the Court will deny Martin and Bayley's motion in limine.[3]

## B. **Daubert** Motion

Martin and Bayley also seeks to exclude portions of the testimony of one of the plaintiffs' experts, Wolf Koch, under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Fed. R. Evid. 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)). In determining whether certain testimony is reliable, the focus of the Court "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. In Daubert, the Supreme Court identified a non-exhaustive list of factors that may assist the Court in assessing the reliability of a proposed expert's opinion including (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review

---

[2] The probative value of the testimony of these witnesses is high as evidence of the cause of the malfunction of this nozzle was destroyed by the fire itself.

[3] Because the Court has ruled that this evidence is admissible for the purposes discussed above, it need not address whether the same evidence is admissible under Fed. R. Evid. 406 to show the routine practice of an organization.

and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." Id. at 592-94. This gatekeeping role is not limited only to expert testimony based upon scientific knowledge, but, instead, extends to "all 'scientific,' 'technical,' or 'other specialized' matters within" the scope of Rule 702. Kumho Tire, 526 U.S. at 147-48. And whether the Court applies the Daubert factors to assess the reliability of the testimony of an expert witness "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150 (quotation omitted).

*Sufficiency of the Evidence*

Part of Martin and Bayley's Daubert motion essentially challenges the sufficiency of the plaintiffs' evidence in this case. It argues that because there is no evidence of a causal connection between Martin and Bayley's alleged negligence and the plaintiffs' injuries, then Mr. Koch's opinion of Martin and Bayley's improper inspection and maintenance practices should be deemed unreliable. (M&B's Mem. Supp. Summ. J. at 17-19.) Similarly, it contends that Mr. Koch's opinions related to the insufficient record keeping practices of Martin and Bayley should be deemed unreliable because there is no evidence in this case that this failure to maintain records contributed to Mrs. Potts' injuries. (Id. at 19-20.) Further, it argues that Mr. Koch's failure to describe what Martin and Bayley would have discovered through a reasonable inspection renders his opinion unreliable. (Id. at 16-17.) The Court does not find that these arguments relate to the reliability of Mr. Koch's opinions. Mr. Koch's criticisms of Martin and Bayley's inspection and maintenance practices may be reliable even where the plaintiffs'

evidence may be lacking in other respects. And whether the plaintiffs' evidence is lacking in other respects is more appropriately addressed in Martin and Bayley's motion for summary judgment where it raises these same arguments.

*Opinion that Attendant's Actions did not Meet Standard of Care*

Mr. Koch opines that the attendant on duty the evening of the fire was negligent primarily by allowing W.P., a ten-year-old child, to pump gas, and also by failing to observe the customers that were dispensing fuel which prevented her from promptly pushing the emergency stop button when the gas spillage occurred or when the fuel ignited. (Koch Report at 5-8, Dec. 9, 2009.) He notes that Huck's own policies requires attendants to prevent children under the age of 12 from pumping gas and that attendants must push the emergency stop button in the case of gas spillage or fire. He also indicates that NFPA 30A, a code provision adopted by Kentucky, provides that "[t]he attendant's primary function shall be to supervise, observe, and control the dispensing of Class I liquids while said liquids are actually being dispensed," (NFPA 30A § 9.4.2, 2003 ed.,) and that "[t]he attendant or supervisor on duty shall be mentally and physically capable of performing the functions and assuming the responsibilit[ies]" required by the code. (Id. § 9.4.3.1.)

Martin and Bayley argues that Mr. Koch's opinion related to the attendant's failure to prevent W.P. from pumping gas should be excluded because it is inconsistent with his opinion that W.P. did nothing wrong in the way he pumped the gas. If he did nothing wrong, then how could the attendant's negligence, if any, in failing to prevent him from pumping gas be the cause of her injuries? Because this opinion would not be helpful to a jury, it contends that the

testimony should be excluded. However, after reviewing Mr. Koch's report and his supplemental affidavit, it does not appear to the Court that Mr. Koch's opinion is inconsistent. Although Mr. Koch concludes that "[t]here is no evidence that suggests the method of fueling utilized for the Potts' vehicle in any way contributed to the failure of the automatic shutoff mechanism of the nozzle[,]" (Koch Aff. ¶ 11, May 14, 2010,) this may not be the only reason this age limitation is imposed. Presumably, the rationale behind the age limitation is that children under the age of 12 are less likely to possess the maturity to respond to this type of emergency. Thus, a jury could find that the attendant was negligent in allowing W.P. to pump the gas.

Martin and Bayley also argues that Mr. Koch should not be permitted to opine that the attendant was negligent by failing to push the emergency shutoff switch allowing more gasoline to fuel the fire when there is no evidence that this failure contributed to Mrs. Potts' injuries. Therefore, it argues that this opinion is irrelevant or lacks foundation. The Court disagrees. Martin and Bayley's argument is based upon the idea that Mrs. Potts' leg caught on fire the instant the fire began. And that immediately thereafter, she got back in her car and out the passenger door to escape the flames. The problem, however, is that Mr. Koch not only indicates that the attendant should have pushed the emergency shutoff button once the fire started, but also as soon as the gas spillage occurred possibly preventing the fire or making the fire less intense. Additionally, although Mrs. Potts got back into her car after her leg caught on fire, the extra fuel may have made her injuries more severe in the time that it took her to get back into her vehicle. This is all for the jury to decide.

*Opinion that Frequent and Proper Inspection is Only Real Defense to Spills*

In a section of Mr. Koch's report entitled "background," he notes that "[f]requent and proper inspection of dispensing nozzles and other hanging hardware is the only real defense against incidents and accidents which may result from gasoline spills." (Koch Report at 4.) Martin and Bayley takes issue with this statement because it implies that "it would be impossible for a nozzle to ever be defectively manufactured or designed." (M&B's Mem. Supp. Summ. J. at 11.) In a supplemental affidavit, however, Mr. Koch makes clear that Martin and Bayley is reading too much into this "background" statement. It appears that what Mr. Koch is trying to get across is that the hazard posed by gasoline that escapes into the environment requires gas stations, which have control over the operation of the fuel system, to perform regular and appropriate inspection and maintenance of the fuel dispensing equipment. (Koch Aff. ¶¶ 8-9.) The Court does not find this testimony improper as Mr. Koch is simply explaining the standard of care and the reason the industry adopted it.

*Industry Standards*

A significant portion of Martin and Bayley's <u>Dabuert</u> motion is devoted to arguing that Mr. Koch failed to appropriately describe Martin and Bayley's standard of care. (M&B's Mem. Supp. Summ. J. at 14-15, 20-25.) Essentially, it argues that Mr. Koch is not experienced in the convenience store industry and that he therefore cannot opine about Martin and Bayley's standard of care; and further, that Mr. Koch's "standards" are those of the nozzle manufacturers, not of the industry.

The Court does not find Martin and Bayley's arguments persuasive. As to his expertise

in the area of inspection and maintenance practices of convenience store gas stations, Mr. Koch indicates:

> During nine years of my employment with Amoco Oil Company, I was responsible for all service station technology. All of the Amoco Oil Company service stations were convenience stores with fuel dispensing equipment. I was required to work with and become knowledgeable of convenience store practices and procedures regarding the dispensing of fuels, including gasoline. Gasoline is classified as a Class I flammable liquid.

(Koch Aff. ¶ 2.) Because Mr. Koch has adequate expertise in the area of convenience store practices and procedures regarding the dispensing of fuels, the Court does not find that his opinions should be limited to "how chemical composition of fuels might cause deterioration in the components of a fueling nozzle." (See M&B's Mot. Supp. Summ. J. at 21.)

The Court also has little trouble in concluding that Mr. Koch has sufficiently described what he believes to be the industry standard for inspection and maintenance practices and his basis for that opinion. He is certainly qualified to assess industry standards and he sufficiently concludes that Martin and Bayley failed to comply with those standards. To the extent that his opinion was influenced by nozzle manufacturers' instructions that were not in existence at the time of this accident or his allegiances with these nozzle manufacturers, they may be inquired into on cross-examination. As stated in Daubert, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)).

*Consideration of Other Potential Causes*

Martin and Bayley also argues that Mr. Koch's opinions are unreliable because he did not consider other potential causes of this incident. But in Mr. Koch's affidavit, he describes to the Court's satisfaction other potential causes for this accident that he ruled out in forming his opinion. (See Koch Aff. ¶¶ 11-17.) Furthermore, an expert is not required to rule out all alternative possible explanations. "[O]nly where a defendant points to a plausible alternative cause and the [expert] offers no explanation for why he or she has concluded that was not the sole cause, that [expert's] methodology is unreliable." Heller v. Shaw Indus., Inc., 167 F.3d 146, 156 (3d Cir. 1999) (quotation omitted). Martin and Bayley also criticizes Mr. Koch's opinion for relying upon W.P.'s version of events in forming his opinions. But the Court believes that this is also better addressed via cross-examination rather than exclusion of Mr. Koch's testimony. See Daubert, 509 U.S. at 596. For these reasons, the Court finds that Mr. Koch's opinions are admissible, and will deny Martin and Bayley's motion in limine to exclude his testimony.[4]

## C. Spoliation of Evidence

Catlow argues that Martin and Bayley's claims against it for indemnity and products liability should be dismissed as a sanction for spoliation of evidence. It argues that given the nature of this products liability case, it is essential to its defense that it be allowed to inspect the

---

[4] Martin and Bayley's citation to Briner v. Gen. Motors Corp., 461 S.W.2d 99 (Ky. 1970) is inapposite. That case did not address whether an expert's testimony was reliable, only whether there was sufficient evidence to submit the issue of causation to the jury. Briner, 461 S.W.2d at 101-102. Again, whether there is sufficient evidence from which the jury can reasonably infer a causal relationship between Martin and Bayley's alleged deficient inspection and maintenance practices is more appropriately addressed on its motion for summary judgment.

entire product in question and any other equipment that may have contributed to Mrs. Potts' injuries. Further, it contends that it has been materially prejudiced by Martin and Bayley's failure to securely store these items as "Catlow's experts could have established additional defenses, provided information about alternative sources of the fire, and then able to further rebut Martin and Bayley's experts' opinions . . . ." (Catlow's Mem. Supp. Spoliation Evid. at 3.) In support of its motion, Catlow has supplied an affidavit of its retained expert in this case who was present at the inspection of this equipment. He notes that it was apparent "that the fuel dispenser had been altered from its original post-fire condition[,]" (Carl J. Natale Aff. ¶ 6, Apr. 12, 2010,) that "at least one breakaway component was missing from fuel dispenser #1[,]" (id. ¶ 7,) and that "the destruction and/or alteration of evidence to fuel dispenser #1 has prevented [him] from discovering additional evidence which could establish additional alternative causes of the fire[,]" (id. ¶ 11.)

In response, Martin and Bayley does not dispute that evidence may have been lost or destroyed, but attempts to shift the blame to the company it hired to store this equipment. According to Martin and Bayley, if evidence was lost or destroyed, it was the result of Jorgenson Petroleum who failed to keep logs of the evidence it collected from the scene of the fire. It argues that because this evidence was kept in Jorgenson Petroleum's exclusive possession and control and it was instructed to keep the evidence secure, Martin and Bayley, in fairness, should not be the recipient of sanctions.

The issue of spoliation was controlled by state law, Welsh v. United States, 844 F.2d 1239, 1243-44 (6th Cir. 1988), until recently when the Sixth Circuit overruled Welsh and

definitely concluded that in federal courts, the issue of spoliation is controlled by federal law, Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009) (en banc). "Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." United States v. Copeland, 321 F.3d 582, 597 (6th Cir. 2003) (citation omitted). It applies when a party has a duty to preserve the evidence. "[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information . . . when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008) (quotation omitted). It is the responsibility of the parties to ensure that relevant information "is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions." Id. (citation omitted).

"[A] proper spoliation sanction should serve both fairness and punitive functions." Adkins, 554 F.3d at 652 (citation omitted). And before the Court may sanction a party for losing or destroying evidence, it must consider the party's fault, which generally falls "along a continuum . . . ranging from innocence through the degrees of negligence to intentionality[.]" Id. at 652-653 (quoting Welsh, 844 F.2d at 1246). The usual sanction for spoliation of evidence is an adverse inference instruction to the jury which generally requires bad faith. In re Nat'l Century Fin. Enters., Inc., No. 2:03-md-1565, 2009 WL 2169174, at *3 (S.D. Ohio July 16, 2009) (citation omitted). However, ordinary negligence may suffice to warrant an adverse inference instruction "if that is necessary to further the remedial purpose of the inference." BancorpSouth Bank v. Herter, 643 F. Supp. 2d 1041, 1061 (W.D. Tenn. 2009) (quoting

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108 (2d Cir. 2002) ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence.")).

Here, the Court finds that even if Martin and Bayley's conduct rises to the level of warranting an adverse inference instruction, which the Court does not decide here, there is insufficient evidence to warrant dismissal of Martin and Bayley's claim, as such relief would require evidence of conduct so egregious "as to amount to a forfeiture of [Martin and Bayley's] claim," Goodman v. Praxair Servs, Inc., 632 F. Supp. 2d 494, 519 (D. Md. 2009) (quotation omitted), or prejudice so substantial so as to "den[y] the defendant the ability to defend the claim[,]" id. (quotation omitted). There is simply no evidence of this type of egregious conduct on the part of Martin and Bayley. And the Court does not find that Catlow has sufficiently shown that it is unable to defend this claim absent the evidence that was lost or destroyed. Accordingly, dismissal is not warranted.

### III. SUMMARY JUDGMENT

Martin and Bayley, Catlow, and Husky have each moved for summary judgment. In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party

satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." <u>Anderson</u>, 477 U.S. at 252.

### A.  Martin and Bayley's Motion

Martin and Bayley's motion raises several arguments. First, it argues that the plaintiffs have failed to show that a dangerous condition existed on Martin and Bayley's premises–an essential element of a premises liability claim–and also that the plaintiffs have failed to show causation. It also argues that it is immune from liability under Kentucky's Product Liability Act as there is no evidence that it modified the nozzle that allegedly malfunctioned. The Court disagrees with each of these arguments and will deny Martin and Bayley's motion for summary judgment.

Under Kentucky law,

"[a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he: (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees; and (b) should expect that

they will not discover or realize the danger, or will fail to protect themselves against it; and (c) fails to exercise reasonable care to protect them against the danger."

Lanier v. Wal-Mart Stores, Inc., 99 S.W.3d 431, 432-33 (Ky. 2003) (quoting Restatement (Second) of Torts § 343). Of course, before a premises owner will be subject to liability for a customer's injuries, the customer must prove that: "(1) he or she had an encounter with a foreign substance or other dangerous condition on the business premises; (2) the encounter was a substantial factor in causing the accident and the customer's injuries; and (3) by reason of the presence of the substance or condition, the business premises were not in a reasonably safe condition for the use of business invitees." Bartley v. Educ. Training Sys., Inc., 134 S.W.3d 612, 616 (Ky. 2004). "Such proof creates a rebuttable presumption sufficient to avoid a summary judgment or directed verdict, and shifts the burden of proving the absence of negligence, i.e., the exercise of reasonable care, to the party who invited the injured customer to its business premises." Id. (quotation omitted); see also Brewster v. Colgate-Palmolive Co., 279 S.W.3d 142, 149-50 (Ky. 2009) (the burden shifting regime of Lanier applies "to cases involving customers or clients or patrons suffering 'slip and falls' or other injuries resulting from dangerous conditions on a business owner's premises.") (emphasis added). Under these principles,

"[t]he occupier must not only use care not to injure the visitor by negligent activities, and warn him of hidden dangers known to the occupier, but he must also act reasonably to inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use of the property."

Lanier, 99 S.W.3d at 433 (quoting William Prosser & W. Page Keeton, Prosser & Keeton on

Torts § 61, at 425-26 (5th ed. 1984)).

Contrary to the Martin and Bayley's argument, there is a genuine issue of material fact as to whether its premises were dangerous. As previously mentioned, the Court has concluded that the testimony of other witnesses that experienced substantially similar failures of the automatic shutoff mechanism at pumps #1, #6, and #8 may be introduced for the purposes of showing that there was some sort of defect in the nozzle. And both Mr. Koch and another expert retained by the plaintiffs, Mark Pozzi, have opined that a nozzle that does not shutoff when the tank is full causing an overflow of gasoline is an extremely dangerous condition. (Koch Aff. ¶¶ 8-9; Pozzi Report at 7-8, Dec. 19, 2009.) Then there is the testimony of W.P. himself who stated that the nozzle he used failed to shutoff when the tank was full. Because the nozzle was ultimately destroyed by the fire, the experts in this case were unable to determine the precise cause of the gasoline spillage. Nevertheless, based upon the evidence they reviewed, the plaintiffs' experts were able to rule out the other most likely causes of this type of gasoline spill. (Koch Aff. ¶¶ 11-17; Pozzi Report at 8-9.) Based upon his analysis, Mr. Pozzi has specifically opined that "[t]he cause of the gasoline leakage was clearly the malfunctioning fuel pump nozzle, which had overfilled the vehicle fuel tank and which continued to pump gasoline at a significant rate out of the fuel filler neck." (Pozzi Report at 9.) From this evidence, a jury could conclude that the malfunctioning nozzle presented a dangerous condition.

Martin and Bayley also contends that in order for the plaintiffs to survive a motion for summary judgment, they must show that through the inspection and maintenance practices identified by Mr. Koch, this nozzle defect would have been discovered. And in its reply brief,

Martin and Bayley make several arguments as to why the utilization of the maintenance practices suggested by Mr. Koch would have failed to discover the defects that allegedly existed in these nozzles.  Primarily, it argues that the defects would not have been detectible through an inspection.  The problem, however, is that Martin and Bayley is arguing that the burden should be on the plaintiff to show that with reasonable care, a defect in the nozzle should have been discovered.  But under <u>Lanier</u>, an injured customer in a premises liability action no longer has this burden.  She must no longer prove how the dangerous condition arrived on the proprietor's premises or how long it had been there.  <u>Lanier</u>, 99 S.W.3d at 436.  Rather, it is now for the defendant to prove that it neither knew, nor in the exercise of reasonable care should have known of the dangerous condition.  <u>Id.</u>  And even if this burden did fall on the  plaintiffs, they have presented sufficient evidence to create a genuine issue of material fact so as to withstand summary judgment.  Here, the plaintiffs have presented evidence from which a jury could conclude that the defect was present for up to four weeks prior to the Potts' incident.  In particular, they plan to present the testimony of seven witnesses who will state that they experienced a failure of the automatic shutoff mechanism at pumps #1, #6, and #8 days and weeks prior to the Potts' incident.  Furthermore, six of these seven witnesses will testify that they told the attendant on duty of these incidents thereby giving notice to Martin and Bayley of a potentially dangerous condition on its premises.  Additionally, the testimony of Mr. Koch tends to suggest that Martin and Bayley should have discovered this defect.  According to Mr. Koch, reasonable inspection and maintenance practices required the company, upon learning of a nozzle malfunction, to take the nozzle out of service until it is inspected and determined to

be reliable or replaced. (Koch Aff. ¶ 9; Pozzi Report at 8.) Mr. Koch also notes that the accepted norm in the oil industry is to perform daily inspections of dispensing equipment, but that he found that Martin and Bayley deviated from a reasonably acceptable preventative maintenance program. (Koch Report at 8; Koch Aff. ¶ 4.) From this evidence, the jury could certainly conclude that Martin and Bayley knew or should have known of the dangerous condition on its premises.

Martin and Bayley also argues that its liability is limited pursuant to the Kentucky Product Liability Act. KRS 411.340, known as a "middleman" provision, provides:

> In any product liability action, if the manufacturer is identified and subject to the jurisdiction of the court, a wholesaler, distributor, or retailer who distributes or sells a product, upon his showing by a preponderance of the evidence that said product was sold by him in its original manufactured condition or package, or in the same condition such product was in when received by said wholesaler, distributor or retailer, shall not be liable to the plaintiff for damages arising solely from the distribution or sale of such product . . . .

Martin and Bayley's argument primarily fails because it was not a distributor or seller of the nozzle that was allegedly defective, a prerequisite for application of the "middleman" provision. See Burke Enters., Inc. v. Mitchell, 700 S.W.2d 789, 792 (Ky. 1985) ("If movant's liability were premised on 'sale' of the product . . . , KRS 411.340 might provide a defense as movant so vehemently contends. But movant is not a seller . . . ."). Additionally, this argument fails because the plaintiffs' claims are based upon a theory of negligence, rather than strict liability. This is important because the "middleman" provision does not apply to a wholesaler, distributor, or retailer that "knew or should have known" that the product that injured the plaintiff "was in a defective condition, unreasonably dangerous to the user or consumer." KRS 411.340. If the

jury finds in favor of the plaintiffs on their claim for premises liability, it could do so only upon a finding that Martin and Bayley "kn[ew] or by the exercise of reasonable care" should have discovered the dangerous condition, and should have "realize[d] that it involve[d] an unreasonable risk of harm to [its] invitees[.]" Lanier, 99 S.W.3d at 433 (quotation omitted). Hence, a finding in favor of the plaintiffs would necessarily preclude limited liability under the Act.

In their reply brief, Martin and Bayley contends that there is evidence to show that Catlow or Husky manufactured the nozzle in a defective condition. This may be true, but it does not relieve Martin and Bayley of its obligation to exercise reasonable care in making its premises reasonably safe for its business invitees. If it knew or should have known that its premises were unreasonably dangerous, it does not matter that the danger was ultimately caused by some third party. See Kroger Co. v. Bowman, 411 S.W.2d 339, 342-43 (Ky. 1967) (grocery store owed duty to protect customer from injuries resulting from defective soft drink carton that fell from store shelf despite a third party manufacturer being responsible for the defect) (citing Brown Hotel Co. v. Pittsburgh Fuel Co., 311 Ky. 396, 224 S.W.2d 165 (1949)). Additionally, Martin and Bayley complains that it should not be held to a higher standard of liability than the manufacturers of the nozzles. That is, the plaintiffs should succeed on their claim against Martin and Bayley only if they can prove a products liability claim against Husky or Catlow.[5] The problem is that the plaintiffs, although they have asserted products liability claims against

---

[5]    Martin and Bayley notes that it has been faced with a Catch-22. It does not want to admit that there was a defect on its premises, but in order to establish Catlow's or Husky's liability, Martin and Bayley will essentially be admitting that there was a defect on its premises.

Catlow and Husky, have only asserted a premises liability claim against Martin and Bayley. Under these circumstances, Martin and Bayley "is held to a *different* standard of liability, not a *higher* one." <u>Burke Enters., Inc.</u>, 700 S.W.2d at 792 (emphasis in original). And that standard has already been set out by the Court above. Except as to issues of apportionment and indemnity, "[t]he question of the liability of the original manufacturer, if any, is simply irrelevant." <u>Id.</u> Martin and Bayley is liable as a premises owner "for its negligence based on what its employees did or did not do, and not otherwise." <u>Id.</u> The Court does not find that the plaintiffs' tactical decision in asserting a premises liability claim rather than a products liability claim against Martin and Bayley is improper. <u>See, e.g.</u>, <u>West v. KKI, LLC</u>, 300 S.W.3d 184, 190 (Ky. Ct. App. 2008) (plaintiff that was injured on ride at amusement park brought premises and products liability claims against the park and appellate court analyzed the facts under both theories of liability); <u>McElhaney v. Marc Glassman, Inc.</u>, 882 N.E.2d 455, 461 (Ohio Ct. App. 2007) (claim based upon injury resulting from a collapsing lawn chair on display at a store stated a claim for premises, not products, liability); <u>Jerista v. Murray</u>, 883 A.2d 350, 357 n.2 (N.J. 2005) ("Plaintiffs properly pled a cause of action sounding in premises liability. . . . Mrs. Jerista, a business invitee of Shop Rite, claimed that the store negligently maintained the mechanical door that caused her injuries. That was a valid theory of liability. . . . Of course, that is not to say that plaintiffs could not have pursued a products liability claim."). Therefore, summary judgment is not appropriate under these circumstances.

## B. Catlow's Motion

Noting that "[t]he identity of the product that caused a plaintiff's injury is the threshold requirement of a products liability claim[,]" <u>Morris v. Wyeth, Inc.</u>, No. 1:07-CV-176-R, 2008 WL 2677048, at *2 (W.D. Ky. June 30, 2008) (citation omitted), Catlow has moved for summary judgment arguing, in part, that there is no evidence that its nozzle was used in the Potts' incident. The Court disagrees. Monica Hancock, a witness to the fire, noticed that after the fire started, the fuel nozzle was still in the fuel port of the vehicle as the fire burned. (Monica Hancock Aff. ¶ 5, May 17, 2010.) Phil Fogle, the fire marshal, noted that when the Morganfield Fire Department arrived at the scene of the fire, the nozzle was no longer in the vehicle, but was laying along side of the car still pumping fuel. (Hazardous Material Incident Report at 2.) Sullivan Curran, Martin and Bayley's retained expert, examined the burn patterns on each of the nozzles that were attached to pump #1. Significantly, the two Catlow nozzles were melted in a way that would indicate that the Catlow nozzles were on the ground during the fire. (Sullivan Curran Decl. ¶ 4, May 7, 2010.) Mr. Curran also noted that the burn patterns on the Husky nozzle were consistent with that nozzle hanging from the dispenser during the fire. (<u>Id.</u> ¶ 5.) Based upon these observations, Mr. Curran opined that "one of the Catlow nozzles had to be the one described by the fire department personnel as being on the ground when they arrived on the scene." (<u>Id.</u> ¶ 6.)

Catlow takes issue with Mr. Curran's opinion because Mr. Curran had previously opined that the identity of the nozzle used by the plaintiffs was unknown. However, the Court does not find that this recent analysis calls into question the validity or reliability of Mr. Curran's

opinion. Martin and Bayley points out that it had previously remained neutral on the issue of whether there was a nozzle defect in this case, but based upon certain perceived alliances between the plaintiffs, their expert, and the nozzle manufacturers, it has abandoned that strategy and has set out to determine whether there was a defect in this and other Catlow nozzles that may have caused Mrs. Potts' injuries. In fact, it claims that it now has circumstantial evidence proving that the nozzle contained a defect. Under these circumstances, the fact that Mr. Curran set out to perform this analysis and supplemented his findings with the results of his analysis simply does not undermine those findings, especially since discovery is still ongoing. And based upon those findings, the Court concludes that there is a genuine issue of fact as to whether W.P. used a Catlow brand nozzle to fill his mother's automobile with gasoline.

Catlow also argues that Martin and Bayley has failed to establish that its nozzle was defective and unreasonably dangerous as designed and manufactured. In response, Martin and Bayley has submitted the affidavit of its attorney under Rule 56(f) indicating that it needs more time for discovery and that to grant summary judgment while discovery is still ongoing, although stayed, would be premature. The Court agrees with Martin and Bayley. Martin and Bayley has put on evidence that a Catlow brand nozzle was used by W.P. in this incident. In its affidavit, it also notes "that Catlow nozzles have experienced problems in the past described as a 'sticking poppet,' which is the main valve of the nozzle." (Edward Bartenstein Decl. ¶ 7, May 7, 2010.) Martin and Bayley also posits that symptoms of a "sticking poppet" are "consistent with descriptions that have been offered in this case, suggesting that nozzles at the Huck's station continued to flow until they were hit or banged on." (Id.) It argues that this

evidence is relevant for purposes of determining whether the Catlow nozzle was distributed with a design or manufacturing defect. (Id.) Having made a proper and timely showing of a need for discovery, granting summary judgment at this point in time would be improper. Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 627 (6th Cir. 2002) ("Summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery.") (quotation and internal markings omitted). Therefore, the Court will deny Catlow's motion for summary judgment with leave to refile at the conclusion of discovery.

## C. Husky's Motion

Nevertheless, the Court finds that Husky is entitled to summary judgment. There is simply no evidence in this case to suggest that W.P. used a Husky brand nozzle to fill his mother's car with gasoline. And there is nothing in Martin and Bayley's affidavit to suggest that it is attempting to discover evidence that would show that a Husky nozzle was used in this case or that its nozzles had a design or manufacturing defect. Notwithstanding this lack of evidence to show that a Husky nozzle was used by W.P., Martin and Bayley argues that more time for discovery is needed in order to determine whether Husky provided deficient recommendations for maintenance practices of its gas nozzles. But the same problem persists. Husky may have provided deficient maintenance recommendations to Martin and Bayley regarding its own nozzles, but that would only be material if the plaintiffs injuries were caused by a Husky nozzle. See, e.g., Morris v. Wyeth, Inc., No 1:07-CV-176-R, 20089 WL 2677048, at *3 (W.D. Ky. June 30, 2008) ("Under Kentucky law, when a persons suffers an injury caused

by the advertising and labeling of a product, it is the company that advertised and labeled the product that is responsible, not the company that advertised and labeled the product's competitors."). There is simply no evidence that a Husky nozzle was used here. Therefore, summary judgment is appropriate.

## IV.  OTHER MOTIONS

Because the parties have adequately briefed the issues raised in their motions, a hearing is unnecessary. The court will therefore deny Martin and Bayley's motion requesting a hearing. The Court will also deny the plaintiffs' motion to strike various documents submitted by Martin and Bayley, but will instead grant Martin and Bayley's motion to seal those same documents. Martin and Bayley acknowledges that it improperly identified W.P., a minor, by his full name in those documents, and has represented that it will substitute the same documents with his name redacted.

## V.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the motions for summary judgment by the defendant, Martin & Bayley, Inc., d/b/a Hucks ("Martin and Bayley") [DN 75], and by the defendant and cross-defendant, Catlow, Inc. ("Catlow") [DN 69] are **DENIED**; the motion by the defendant and cross-defendant, Husky Corporation ("Husky"), for summary judgment [DN 57] is **GRANTED**; the motions in limine [DN 67 and DN 77] and the motion for a hearing [DN 83] by the defendant, Martin and Bayley, Inc., the motion by the defendant and cross-defendant, Catlow, Inc., for sanctions for spoliation of evidence [DN 70], and the motion by the plaintiffs, Vanessa L. Potts and John L. Potts, to strike [DN 89] are each **DENIED**; and the motion by the

defendant, Martin and Bayley, Inc., to seal [DN 122] is **GRANTED**. The clerk is hereby directed to seal the following documents: DN 65, DN 65-1, DN 75, DN 75-1, DN 75-2, DN 77, DN 77-2, DN 77-5, DN 77-6, DN 77-7, DN 77-10, DN 77-15, DN 77-16, and DN 83.

**IT IS FURTHER ORDERED** that the defendant, Martin and Bayley, Inc., shall file redacted substitutes for the above enumerated documents within ten (10) days of the entry of this Order.

cc:     Counsel of Record