**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO. 4:08-CV-00015-JHM**

| | |
|---|---|
| **VANESSA L. POTTS and JOHN L. POTTS** | **PLAINTIFFS** |
| **v.** | |
| **MARTIN & BAYLEY, INC., d/b/a/ Hucks**, **CATLOW, INC. and HUSKY CORPORATION** | **DEFENDANTS** |
| **and** | |
| **MARTIN & BAYLEY, INC., d/b/a/ Hucks** | **CROSS-CLAIMANT** |
| **v.** | |
| **CATLOW, INC. and HUSKY CORPORATION** | **CROSS-DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant/Third-Party Defendant Catlow, Inc.'s Motion

to Exceed Page Limit [DN 203] and Motion to Exclude Opinions and Proposed Testimony of Martin

& Bayley, Inc.'s Experts [DN 206]. Fully briefed, these matters are ripe for decision. For the

following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Catlow's motions.

**I. BACKGROUND**

This matter involves a fire that occurred at a Huck's self-service gas station in Morganfield,

Kentucky, on January 14, 2008. Plaintiffs' allege that the fire was caused when a gas pump failed

to shut off causing gasoline to overflow out of the gas tank and onto the ground. The gasoline then

ignited causing Plaintiff Vanessa Potts to be severely burned. This action was filed by Plaintiffs

against the owner of the Huck's, Martin & Bayley, Incorporated, on February 12, 2008. Martin &

Bayley then filed a Third-Party Complaint against Catlow, Incorporated and Husky Corporation, the

manufacturers of the nozzles used by Huck's at the time of the fire. Thereafter, Plaintiffs' amended their Complaint to also include claims against Catlow and Husky.

Catlow now seeks to exclude the opinions and testimony of Martin & Bayley's experts, Rich MacInnes and Sullivan Curran. MacInnes's proposed testimony concerns identification of the nozzle that started the fire, as well as the identification of an alleged defect within that nozzle. Curran's proposed testimony concerns the refueling conditions of the Huck's gas station, the likely cause of the fire, and standards related to UL certification.

## II. STANDARD OF REVIEW

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)). In determining whether certain testimony is reliable, the focus of the Court "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. In Daubert, the Supreme Court identified a non-exhaustive list of factors that may assist the Court in assessing the reliability of a proposed expert's opinion including (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general

2

acceptance" within a "relevant scientific community." Id. at 592-94. This gatekeeping role is not limited only to expert testimony based upon scientific knowledge, but, instead, extends to "all 'scientific,' 'technical,' or 'other specialized' matters within" the scope of Rule 702. Kumho Tire, 526 U.S. at 147-48. Whether the Court applies the Daubert factors to assess the reliability of the testimony of an expert witness "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150 (quotation omitted).

### III. DISCUSSION

Catlow seeks to exclude the testimony and opinions of Rich MacInnes on the grounds that he is not qualified to offer such opinions and that his opinions are unreliable and speculative. Catlow seeks to exclude the testimony and opinions of Sullivan Curran on the grounds that his opinion is based upon the allegedly inadmissible opinion of MacInnes and that his opinion regarding which nozzle started the fire is unreliable and speculative.

### A. Rich MacInnes

#### 1. Qualifications

Catlow contends that MacInnes "is not qualified to render opinions and testify to the identity of the nozzle used by W.P., nor whether that nozzle was defective as manufactured or designed." (Catlow's Mem. Support Mot. Exclude Martin & Bayley's Experts 19 [DN 207].) Catlow argues that MacInnes is not a professional engineer, licensed fire investigator, fire and cause origin expert, or metallurgist. Catlow contends that he has never worked in the fuel nozzle industry, designed or machined a fuel nozzle, or performed a dimensional analysis of a fuel nozzle.

In response, Martin & Bayley cites MacInnes's thirty-one years of experience in the engineering field as proof of his qualifications. This experience includes five years in a position

analyzing valves, which are similar to the poppet stem that is at issue in this case. (Martin & Bayley's Opp. Catlow's Mot. Exclude Expert Opinions 3[DN 239].) MacInnes testified at his deposition to his experience "reviewing valve stem, valve stem against graph foil, Teflon packing, and . . . look[ing] at things like stem finish and different types of quarter turn, actuator valves or full turn or stems that go up or down." (Id., Ex. 1, MacInnes Dep. 175:15-19.) MacInnes also has experience analyzing manufacturing processes and safety procedures in a multitude of industries. (See Martin & Bayley's Opp. Catlow's Mot. Exclude Expert Opinions 3.)

The Court finds that MacInnes is qualified through his education, skill, and experience in the manufacturing field to render opinions regarding the identity and design of the nozzle at issue in this case. MacInnes has a degree in Engineering, and although he has not dealt specifically with fuel nozzles, Catlow does not dispute the fact that he has thirty-one years of experience conducting analyses of products and safety features in several different fields, including manufacturing. Nor does Catlow dispute that MacInnes has relevant experience analyzing valve stems and valve stem movement in other products, which consequently is the defect that he has identified as causing the overflow of gasoline in this case. While Catlow has highlighted MacInnes's alleged failure to use the proper terminology of a metallurgist, the Court does not find that such a failure demonstrates that MacInnes is unqualified to render opinions regarding the identity, design, and manufacture of this nozzle.

However, the Court agrees with Catlow that MacInnes is not qualified to give opinion testimony regarding any alteration in the structural integrity of the nozzle resulting from the fire. Martin & Bayley admits that MacInnes is not a metallurgical expert, but contends that he is qualified to give opinion testimony regarding the structural integrity of the nozzle because he has consulted

4

two metallurgical experts at IMR Metallurgical Services Louisville, LLC. MacInnes contends that the metallurgical experts told him that the fire would not have altered the structural integrity of the nozzle. However, MacInnes's reports fail to disclose the identity of those experts or the basis of their opinions.

Under F.R.E. 703, an expert is entitled to base his opinion on facts or data made known to him, even if those facts or data are inadmissible, so long as they are "of a type that are reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. A testifying expert can properly base his opinion on the "reports and opinions of other experts where those reports are of a type reasonably relied upon by experts in the particular field." Logan v. Cooper Tire & Rubber Co., 2011 WL 3267891, at *4 (E.D. Ky. July 29, 2011). However, the Court finds that the inadmissible hearsay statements of an unnamed consulting expert, where neither the date nor content of the conversation is disclosed, is not the type of information that is reasonably relied upon by experts in MacInnes's field. See Cummins v. Lyle Indus., 93 F.3d 362, 371-72 (7th Cir. 1996) (finding expert's reliance on hearsay statements from unidentified individuals on unspecified dates was insufficient under Rule 703). The Court finds that the opinions of unidentified metallurgical experts are not the type of information reasonably relied upon by experts in MacInnes's field.

Accordingly, the Court finds that MacInnes is not qualified to render an opinion on the structural integrity of the nozzle. MacInnes's undocumented consultation does not give him the necessary expertise and experience in the metallurgical field to render expert testimony that will aid the jury. Therefore, the Court finds that MacInnes's opinions and testimony regarding the structural integrity of the nozzle are not admissible.

## 2.  Reliability

Catlow next challenges MacInnes's opinions and proposed testimony on the grounds that they are not reliable, but are instead speculative guesswork.

### i. Nozzle Identification

Catlow first takes issue with MacInnes's opinion identifying the nozzle used during the accident as a Catlow nozzle.  Catlow contends that MacInnes's conclusion that the Catlow nozzle was at the center of the fire based upon the last burn patterns on the nozzle is unreliable.  Catlow's own fire cause-and-origin expert has opined that only the first burn patterns are useful.  Catlow also contends that MacInnes failed to take into account several factors that could have influenced the damage sustained by the different nozzles, such as the direction of the wind, the direction from which the fire was suppressed by the fire department, and the presence of an additional 20 gallons of fuel that could have been added to the fire from the eventual structural failure of the Potts' vehicle's gas tank.  Catlow cites the opinion of its own expert, Carl Natale, who has opined that is scientifically impossible to determine which nozzle was the nozzle used on that night.

Martin & Bayley contends that MacInnes's identification of the Catlow nozzle is reliable because he examined burn patterns on the nozzles, melted plastic patterns on the dispenser and on the nozzles, and x-rays of the different nozzles.  MacInnes also reconstructed the fuel dispenser matching the different nozzles to their respective positions on the dispenser using melting patterns and fire damage to realign the different pieces.  Martin & Bayley argues that simply because Catlow's own expert has opined that it is impossible to know which nozzle was the nozzle used, does not mean that MacInnes's opinion is unreliable.

The Court finds that MacInnes's identification of the nozzle is reliable and would assist the

6

trier of fact, notwithstanding the fact that Catlow's expert came to the opposite conclusion. That the

opinions come to different conclusions is an issue that is better addressed through vigorous cross-

examination rather than whole-sale exclusion of MacInnes's opinion. See Daubert, 509 U.S. at 596.

Although Catlow contends that MacInnes's opinion is unreliable because it failed to take into

account several factors, which it deems to be vital, the Court finds that such a failure is not fatal.

MacInnes's opinion is based upon "witness statements, photographs taken from the scene at the time

of the incident, and analysis of physical artifacts removed from the scene of the incident."

(MacInnes Supp. Report, June 13, 2011, App'x 1:1 [DN 178].) Catlow's complaint regarding these

allegedly unaccounted for factors goes to the weight of the testimony, not its admissibility. The

Court finds MacInnes's opinion regarding the identity of the nozzle to be sufficiently reliable and

admissible.

### ii. Nozzle Defect

Catlow next challenges the reliability of MacInnes's opinion regarding the alleged defect

within the nozzle. MacInnes has opined that

> the mechanical action of the poppet subassembly, within the constraints of the
> machined nozzle body, per the design of the assembled components, further being
> acted upon by the lower lever, raised the poppet assembly into a position whereby
> it became stuck as a result of out-of-tolerance conditions and defective components
> (burrs, cuts, rough edges on both the main poppet and the valve seat).

(MacInnes Third Report, March 15, 2011, at 16 [DN 171].)  In a supplemental report to his third

report, MacInnes opined that

> To be certain, the Poppet remained in the unintended open position, due to a
> combination of nozzle design characteristics and machining practices. Upon further
> examination of representative nozzles manufactured in 2007 and supplied by Martin
> & Bayley it became clear that significant side forces were acting on the poppet stem.
> As evidenced by the existence of scratches caused by the packing spring on the
> poppet stem; the unusual wear caused by the lower lever on the stem; the noticeable

scratches on the valve seat in a forward position with the spout pointed forward—most likely caused by the poppet die cast flashing. This is consistent with the final position of the main poppet in the Nozzle.

(MacInnes Supp. Report, June 13, 2011, at 5 [DN 178] (emphasis omitted).)

Catlow contends that MacInnes's opinion that the nozzle experienced an unintended fuel overflow due to a stuck poppet stem is unreliable for several reasons, including that: (1) the measurements of the nozzle taken by a coordinate measurement machine (CMM) are unreliable; (2) MacInnes did not account for customer error or that the Potts' vehicle was defective; and (3) MacInnes has not physically tested his theory.

Catlow's experts contend that the measurements of the nozzle are unreliable because the nozzle's structural integrity was altered in the fire and because there was too much debris on the nozzle to make the measurements accurate. Catlow next argues that the measurements are inaccurate because MacInnes did not know how to properly align the CMM machine with the nozzle. Catlow contends that when it properly aligned the machine and the nozzle, its results showed that the exemplar nozzles were within specification. Catlow further argues that once MacInnes was shown how to properly align the two, that his results also showed that the nozzles were within specification. Martin & Bayley vehemently deny this claim.

While Catlow has claimed that the measurements of the subject nozzle are unreliable because of alterations and debris, MacInnes conducted similar tests on several other exemplar Catlow nozzles and discovered similar results. (MacInnes Second Report, November 18, 2010, at 14 [DN 146].) MacInnes's reports detail the methodology and results of his tests on the nozzles using the CMM. Catlow has used the same methodology, but reached different results. At trial, each side will be permitted to explain to the jury why it believes that its measurements are the correct

8

measurements, leaving the jury to determine the appropriate weight to give such evidence. Therefore, the Court finds that such arguments go to the weight of the evidence and not its admissibility.

Catlow next argues that MacInnes's opinions are unreliable because he failed to properly consider several factors in his analysis, including customer error and the Potts' vehicle. However, many of these factors are not relevant to whether the nozzle had a defective poppet stem that caused unintended overflow. Whether Mrs. Potts left the vehicle running or disregarded warning signs may influence what started the fire, but it has no bearing on what caused unintended overflow in the nozzle. As the Court has previously stated, an expert is not required to rule out all alternative possible explanations. "[O]nly where a defendant points to a plausible alternative cause and the [expert] offers no explanation for why he or she has concluded that was not the sole cause, that [expert's] methodology is unreliable." Heller v. Shaw Indus., Inc., 167 F.3d 146, 156 (3d Cir.1999) (quotation omitted). While these factors may be plausible alternative causes of the fire's ignition, they are not plausible alternative causes of the nozzle's unintended overflow.

Catlow also contends that MacInnes's failure to consider a recall of a fuel line in the Potts's Pacifica or that W.P. accidentally re-engaged the automatic pumping function demonstrates the unreliability of MacInnes's opinions. However, Martin & Bayley has offered an explanation as to why these two possibilities could not be the cause of the unintended overflow. As for the claim that the overflow was caused by W.P.'s error in re-engaging the automatic shutoff, MacInnes points to W.P.'s testimony that gasoline was overflowing from the tank before he ever had a chance to re-engage the automatic shutoff, and concludes that, W.P.'s actions could not have caused the unintended overflow. Similarly, the recall of the Potts' Pacifica's fuel line does not explain W.P.'s

9

testimony that gasoline continued to flow from the nozzle and out of the gas tank. The Court is satisfied with MacInnes's efforts to rule out other possible alternative causes and finds that his opinion in this respect is sufficiently reliable.

Catlow's further argues that MacInnes's opinions are not reliable because MacInnes has conducted no independent testing of his theory that the nozzle's failure to be within specification caused sideways forced to act upon the poppet stem in such a way as to cause it to eventually stick in the open/upward position. The Court recognizes that "Daubert attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." Best v. Lowe's Home Centers, Inc., 563 F.3d 171, 176-77 (6th Cir. 2009). However, the Daubert factors do not constitute a definitive checklist or test. Rather, the "gatekeeping inquiry must be 'tied to the facts' of a particular case," depending on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co., 526 U.S. at 150; see also Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 430 (6th Cir. 2007). Depending on the facts of a given case, it is well within a district court's discretion to find an expert's opinion reliable although he has conducted no testing. See Clay v. Ford Motor Co., 215 F.3d 663, 668-69 (6th Cir. 2000) ("The district court, in its discretion, could have decided that Richardson's failure to test his theories went to the weight of his testimony regarding defects in the Bronco II, not to its admissibility."); Jacobs v. Tricam Indus., Inc., 2011 WL 3957667, at *4 (E.D. Mich. Sept. 8, 2011) (finding that "testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence."); Wendorf v. JLG Indus., Inc., 2010 WL 148255, at *4 (E.D. Mich. Jan. 11, 2010) (finding expert's failure to test goes to the weight of the testimony); Williams v. General Motors Corp., 2007 WL 3232292, at *2 (N.D. Ohio Oct. 30,

2007) ("Mr. Rosenbluth has relied on various sources, including academic and government studies. His failure to perform his own independent tests or studies of his theories goes to the weight of his testimony, not to its admissibility.")

In the instant case, MacInnes has conducted testing regarding certain measurements of the allegedly defective nozzle that show that the nozzle is out of specification. He has further tested other exemplar Catlow nozzles manufactured at approximately the same time as the nozzle involved in the fire and found many of those nozzles to also be out of specification. MacInnes opined that the out of specification machining dimensions would cause significant sideways forces to be at work within the nozzle, which could cause the poppet stem to stick open. MacInnes examined the exemplar Catlow nozzles and found that "significant side forces were acting on the poppet stem. As evidenced by the existence of scratches caused by the packing spring on the poppet stem; the unusual wear caused by the lower lever on the stem; [and] the noticeable scratches on the valve seat in a forward position with the spout pointed forward[.]" (MacInnes Supp. Report, June 13, 2011, at 5.) MacInnes's theory, that the unintended overflow was caused by out of specification machining dimensions is further supported by Catlow's own CEO, Cameron Carmack. Carmack testified that poor machining dimensions would be the first issue he would check if he was faced with an intermittent non-shutoff/overflow problem. (Carmack Dep. 164:12-25.)

The Court finds that MacInnes's opinions regarding the alleged defect are not junk science. MacInnes has examined and tested the physical evidence. He has conducted a fault tree analysis to identify the alleged defect in the nozzle and to rule out several other potential causes. This is an accepted methodology, as evidenced by its inclusion in NFPA 921, and it is one that is not challenged by Catlow. He has engaged in reverse engineering using the subject nozzle, exemplar

11

nozzles, warranty records, and Catlow's documented design changes. Given the facts of this case, and these several factors, the Court finds MacInnes's opinion to be reliable. The fact that MacInnes has not conducted individual testing of his theory does not render his opinion inadmissible, rather, the lack of testing goes to the weight of his testimony, not its admissibility.

**B. Sullivan Curran**

Catlow also seeks to exclude the opinions of Martin & Bayley's expert, Sullivan Curran. Catlow argues that Curran's opinion regarding the defective condition of the nozzle is "completely dependent on the opinions and evidence presented by MacInnes" and because MacInnes's opinions are not admissible, Curran's opinions are likewise inadmissible. (Catlow's Mem. Support Mot. Exclude Opinions and Proposed Test. Martin & Bayley Inc.'s Experts, 39.) As the Court has discussed above, with the exception of his opinion regarding the structural integrity of the subject nozzle, MacInnes's opinions are admissible. Therefore, Catlow's argument that Curran should be excluded due to his reliance on inadmissible evidence fails.

Catlow next seeks to exclude Curran's opinions claiming that the opinions will not aid the trier of fact in determining "why or how this fire may have occurred and/or determin[ing] the potential role that the Catlow nozzle may have played in that scenario." (Id.) To the extent that Catlow is arguing that Curran's opinions are not relevant, the Court disagrees. His opinions regarding the multiple potential causes of the fire address the different scenarios that could have resulted in Mrs. Potts suffering her injuries without W.P. suffering similar injuries. (Curran First Report, February 24, 2010, at 13 [DN 56].) As such, the Court finds that his opinions regarding the ignition of the fire will assist the trier of fact in determining whether the Catlow nozzle was a substantial cause of Mrs. Potts' injury.

Catlow's final argument seeks to exclude Curran's opinion and testimony identifying the Catlow nozzle as the nozzle used by W.P. Curran's opinion that W.P. was using a Catlow nozzle is based on his belief that the melting patterns of the Catlow nozzles and the presence of red plastic on the Husky nozzle demonstrate that the Husky nozzle was in the dispenser at the time of the fire. (Curran Dec., May 7, 2010, at ¶ 4-5 [DN 82].) Catlow contends that this opinion is unreliable because it is based on a visual examination of partially destroyed objects. Catlow further cites its own expert, Carl Natale, for the proposition that there is no scientific way to discern which nozzle was used by W.P. As the Court found above with respect to MacInnes's identification of the subject nozzle, Catlow's arguments go to the weight of Curran's testimony, not its admissibility.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant/Third-Party Defendant Catlow, Inc.'s Motion to Exceed Page Limit [DN 203] is **GRANTED**.

**IT IS FURTHER ORDERED** that Catlow's Motion to Exclude Opinions and Proposed Testimony of Martin & Bayley, Inc.'s Experts [DN 206] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to MacInnes's opinions regarding the structural and metallic integrity of the nozzle. It is **DENIED** as to all other aspects.

cc: counsel of record